Filed 6/24/15  P. v. Singh CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069047 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02673) |
| v. | |
| HARPREET SINGH, | |
| Defendant and Appellant. | |

A jury acquitted defendant Harpreet Singh of forcible rape but found him guilty of rape of an unconscious person.  (Pen. Code, § 261, subd. (a)(4).[1])  Defendant was sentenced to a prison term of three years.  Defendant contends he was provided ineffective assistance of counsel because his trial counsel did not object to the expert opinion of the doctor who performed the sexual assault examination of the victim concerning the effects of alcohol on a human being on the grounds that the doctor was not qualified to render an opinion about alcohol intoxication.  Defendant also contends

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

the trial court improperly allowed admission of the victim's hearsay statements, denied probation, and denied retroactive application of an amendment to section 4019 regarding presentence conduct credits.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

An amended information charged defendant, who was then age 19, with two counts stemming from the same incident:  (1) rape of an unconscious person (§ 261, subd. (a)(4)), and (2) rape by means of force, violence, duress, menace, or fear of injury (§ 261, subd. (a)(2)).[2]

### Prosecution Case

On April 22, 2010, the victim, D.R., drove from her Ceres home to visit her platonic friend, Sanjay Sharma, and spend the night at his home in Elk Grove.  By arrangement, the victim brought drinking glasses for herself and Sanjay and a third glass for Sanjay's friend -- defendant, whom the victim first met earlier that day.  The victim met up with Sanjay at a towing company's premises, where Sanjay and defendant were riding an all terrain vehicle (ATV).  Two male friends, brothers "Indy" and "Dal," joined them.  Around 7:00 p.m., Sanjay and the victim went to buy food and liquor.  Sanjay told her that his parents were coming home, so the party was moving to the home of Indy and Dal.  The victim was unfamiliar with these people and made plans to spend the night at a hotel.  At the party, the victim "hung out" with Indy's girlfriend, ate some sausage, and consumed "about four" drinks of Hennessy liquor and apple juice.  The victim did not drink alcohol often but believed she had a "mid tolerance."  She started feeling the effects of the alcohol as she began her third drink.

---

[2]  Defendant was not charged with rape of an intoxicated person.  (§ 261, subd. (a)(3).)

Defendant arrived at the gathering after 9:00 p.m. The victim did not interact with him beyond perhaps saying hi.

Around 10:00 p.m., the victim was on her fourth drink, was "buzzing," felt she "drank a little too much," and got dizzy when she stood up. After asking Sanjay to come get her when he was ready to leave, Indy took her to a guest room to lie down. The victim told Sanjay to get her when he was ready to leave because she was in no shape to drive. The room was dark. The victim got under the bed covers fully clothed, and fell asleep. Sanjay checked on the victim at least twice while she slept.

The victim was startled awake to find defendant on top of her, thrusting his penis in and out of her vagina. Defendant had an erection but did not ejaculate. Both were naked below the waist. She did not recall if she was still under the covers. The victim said, "[W]hat the fuck," and screamed at defendant to stop. He ignored her. Her right bicep was pinned down, but she managed to scratch defendant's left cheek, and she tried to kick him. She got out of bed, pulled on her clothes, and left the room. The victim had not consented to have sex with defendant. Defendant was six feet five inches tall and weighed about 240 pounds, while the victim was five feet three inches tall and weighed 145 pounds.

Hysterical, the victim went to the kitchen and screamed to Sanjay and Indy that she "was fucking raped" and wanted to call the police. Sanjay, who had just arrived back at the house after a trip to the store, took her outside to try to calm her down. Sanjay testified that the victim was yelling to call the police.[3] She saw a red vehicle blocking her car and tried to get the license plate, but Indy moved the vehicle, saying he was taking it to the tow yard.

---

[3] In his testimony, Sanjay denied that she complained about being raped.

The victim drove off in her car, called her cousin Alex, and told him she had been raped. The cousin picked up two friends and met the victim at a McDonald's about 35 to 45 minutes later. She was crying and told them what happened. The cousin wanted to get the license number, so they went to the tow yard with the cousin driving and the victim giving directions, but the red car was not there. They drove to Indy's and Dal's home. The cousin banged on the door, demanding the male who raped the victim.

Police arrived in response to a dispatch at 2:23 a.m. on April 23, 2010, to find three males and a female outside the home. An officer ordered them to sit down and raise their hands. The officer testified that the victim "made a spontaneous statement that she was raped and the people inside knew the person that did it and where he was at." The officer observed the victim appeared to be intoxicated. She smelled of alcohol, had bloodshot eyes, and had an unsteady gait.

People inside the house initially told police the suspect had left but, when advised they could be arrested for harboring a fugitive, they said he was asleep upstairs. The police detained defendant, who appeared sleepy but not surprised, intoxicated but not incoherent. He had a small, fresh scratch on his left cheek. Sanjay testified that he did not see any injuries to defendant's face before the barbeque. When the police brought defendant out of the home, the victim identified him as the perpetrator. The victim showed an officer the room where she was raped. The bed had been made since she left. The police observed the red car behind a berm in back of Indy's home.

At 4:30 a.m., the police took the victim for a forensic examination by pediatrician Angela Rosas, who is the medical director of the sexual assault team in Sacramento. She specializes in child abuse cases and also performs forensic exams on adult patients. Dr. Rosas had been a doctor for 20 years, practiced in a community clinic and held teaching positions at West Virginia University and the University of California, Davis. She had performed approximately 3,000 sexual assault exams.

4

Dr. Rosas testified that the victim was fatigued, had nausea, had vomited, and appeared "somewhat drunk" but was "awake enough to have judgment, to be able to answer all the questions." She was not talking strangely, swaying, slurring, or unsteady. The victim said she had been sleeping, awoke to an act of sexual intercourse, and scratched and kicked the perpetrator. The doctor saw an abrasion on the victim's right forearm, which victim said she did not have before the rape. The doctor saw no injury to the victim's genital area. As we discuss in more detail, *post*, the doctor testified the lack of genital injury was both consistent with the assault described by the victim and consistent with consensual vaginal intercourse. The doctor testified that physical injury is lacking in about half the adult patients who describe non-consensual intercourse.

Dr. Rosas testified on cross-examination that in response to questions, the victim said she had not been grabbed, pinched, or physically restrained in any way.

The parties stipulated that a sample of the victim's blood taken at 6:43 a.m. revealed a blood-alcohol level of 0.08 percent. It was also stipulated that the average rate of alcohol burnoff is 0.02 percent per hour, from which it could be extrapolated that the victim's blood-alcohol level at 11:20 p.m. would have been approximately 0.22 percent.

In response to juror questions previewed by the trial court and counsel and posed by the trial court, Dr. Rosas testified a person with blood alcohol of 0.22 is "extremely drunk, would be mostly unconscious, unable to wake a person up." The doctor would not expect such a person to be able to communicate well with a police officer. The doctor added, however, that the effects of alcohol depend on an individual's tolerance. The doctor acknowledged she had no training and was not an expert in how alcohol absorbs into the body, or how alcohol affects people in general; nor did she know the victim's individual tolerance or her blood-alcohol level at the time of the examination. The doctor said she was in court only to testify about her examination of the victim.

5

## Defense Evidence

Defendant testified. He got drunk on Crown Royal at the party, vomited in the back yard, and went into a bathroom off the guest room to wash up. While he was urinating, the victim walked into the bathroom, wrapped her arms around him, grabbed his hand, and guided him into the guest room. She turned on the light, took off her clothes, and lay down on the bed. He joined her. They began to have intercourse. He had difficulty because he was still nauseated and dizzy. She helped him put his penis inside her. She never told him no, never said to stop, and never hit, kicked, or scratched him. He became winded from the alcohol and vomiting and rolled off of her without ejaculating. The victim got up, dressed, and left the room without saying anything to defendant. Defendant did not recall how his face got scratched, but he denied that it happened during intercourse with the victim, and told the police he may have scratched his face on the bed.

During his testimony, defendant admitted that he and the victim were strangers who just met that day, he had talked to her a total of less than 15 minutes, and there had been no sexual flirtation between them. He also admitted that he could not remember her name and only remembered that her first name started with the letter "D." He was aware that she was intoxicated, was not feeling well, and had been taken to the bedroom to lie down. They were both intoxicated, but she was more intoxicated.

## Verdicts and Sentencing

The jury found defendant not guilty of the forcible rape (count two) but guilty of rape of an unconscious person (count one).

The trial court denied probation and sentenced defendant to state prison for the lower term of three years.

## DISCUSSION

### I. Doctor's Testimony Concerning the Effects of Alcohol

Defendant contends the trial court improperly allowed, and defense counsel rendered ineffective assistance by failing to object to, Dr. Rosas' unqualified expert testimony about the effect of alcohol on the human body. In particular, defendant complains that the doctor's testimony that a person of the victim's size with a blood-alcohol level of 0.22 would likely be unconscious and unable to wake up was beyond her expertise. Defendant argues he was denied due process and a fair trial in violation of his federal and state constitutional rights. He maintains it was reasonably probable the jury would not have convicted him without Dr. Rosas' testimony. We disagree.

### A. Background

After the attorneys completed their questions, the trial court, asked the jurors whether they had any questions. Written questions were submitted by some jurors.[4] After a bench conference with counsel, the court asked the doctor to respond to a juror who wrote: "I'm not sure what .22 percent alcohol level means in regard to how drunk a person may be." The court asked the doctor: "Do you have any education, training or experience that might be responsive to the juror's question?" Thereafter, the doctor provided the following testimony:

"[DR. ROSAS]: Yes. [¶] The general information that came in the stipulation is -- .08 blood alcohol level is what is -- you would be legally drunk for driving that many of you may be familiar with. [¶] So .22 is extremely drunk, would be mostly unconscious, unable to wake a person up.

"THE COURT: Does that depend on a person's tolerance to alcohol?

"[DR. ROSAS]: Yes.

---

[4] The actual written questions are not in the record before us.

7

"THE COURT:  Can you explain?

"[DR. ROSAS]:  A person who -- who drinks a lot -- an alcoholic -- may not be as -- as most affected as someone who doesn't drink as often.  [¶]  But -- .22 is going to have a significant effect on somebody who doesn't drink very often.  [¶]  But even an alcoholic is going to have an effect with a .22.  [¶]  A lethal level would be .4 or .35.

"THE COURT:  Lethal meaning potentially fatal?

"[DR. ROSAS]:  Yes.

"THE COURT:  . . . [D]o you have any recollection of how [the victim] appeared -- her state of sobriety when you [were] examining and interviewing her?[5]

"[DR. ROSAS]:  Yes.  [¶]  I actually wrote some notes down about it.  [¶]  But -- she was very tired and nauseous.  She was vomiting in the office.  We had to get a bucket for her.

"THE COURT:  Okay.  Do you know -- do you recall anything other than that?

"[DR. ROSAS]:  No."

After some questions by the court about lack of injury, the court asked another juror question:

"THE COURT:  [¶]  Could someone with a .22 blood alcohol level not possibly remember consenting to sex, then passing out during, and then before ejaculation waking up not remembering having consented to sex?  [¶]

"[DR. ROSAS]:  [¶] . . . [¶]  I think that is something that has to be determined in the court of law and amongst the jury, because the .22 -- alcohol level of that level is a person who is unconscious in most cases or someone who is pretty close to it.  [¶]  And I think the jury has to decide as to whether the person [in] that condition has the ability to

_____

**5**  The record is not clear whether this was a question posed by a juror or the court's own question.

8

truly have the cognitive ability and judgment to consent to sexual activity regardless [of] what they may be able to say or not."

In later recross-examination by defense counsel, the doctor testified that the things that made her think the victim was still drunk was that the victim had said she had been drinking alcohol, she was fatigued, and she was throwing up. Thereafter, the jury heard the following questions and answers:

"[DEFENSE COUNSEL]: What training do you have, if any, to be able to watch somebody talk to you and communicate with you and to determine whether or not that person is drunk or not?

"[DR. ROSAS]: The -- my medical training throughout would be able to describe whether [a] person's medically stable to be able to have a conversation, cognitive testing on them -- neurological examination.

"[DEFENSE COUNSEL]: So you're able to say that she can communicate with you based on all your training. [¶] But you have no training at all to be able to objectively evaluate somebody to see whether or not they're actually drunk at that point in time?

"[DR. ROSAS]: Being drunk is a continuum as far as how drunk a person is.

"[DEFENSE COUNSEL]: And there's many factors that play into all that; right?

"[DR. ROSAS]: Physiological factors you mean?

"[DEFENSE COUNSEL]: Yes.

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And you said that a .22 that you would be able to give us an opinion -- medical opinion as to how drunk a person would be. [¶] Is that your belief?

"[DR. ROSAS]: The -- there would be a -- a range of it. [¶] But, yes.

"[DEFENSE COUNSEL]: And I think what you actually said was at .22 you're going to be unconscious?

9

"[DR. ROSAS]: Or close. [¶] . . . [¶] Or close to unconscious, yes.

"[DEFENSE COUNSEL]: Unless you are an alcoholic or you have very high tolerance level -- something along those lines. [¶] Is that [] what you said to us earlier?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: Would [y]ou expect someone who is -- is that drunk to be able to drive?

"[DR. ROSAS]: They wouldn't be able to drive very well. [¶] But people do drive drunk.

"[DEFENSE COUNSEL]: I -- again you keep answering in possibilities. [¶] We're talking about generally speaking, because you testified earlier that at .22 you're going to be unconscious. You were clear about that answer. [¶] But then you kind [of] put a caveat on it that could depend on various factors like your tolerance -- all of those things -- whether you are alcoholic -- all of those things. [¶] I'm asking you generally speaking, Doctor, if you are .22 [*sic*] based on your opinion that you would be unconscious, would you be able to drive a vehicle?

"[Prosecutor objects.]

"[Trial court overrules prosecutor's objection.]

[¶] . . . [¶]

"[DR. ROSAS]: Okay. As I had stated there's a continuum about being -- how drunk a person is. [¶] And obviously people do drive drunk. So at .22 a person could get in the car and drive very badly. Some people would be able to do that. People do drive drunk and are arrested with .22 too. But they would not be able to drive well.

"[DEFENSE COUNSEL]: And at the same time your opinion if you are .22 you're going to be either unconscious -- let me ask you this. [¶] If you -- if you're unconscious, would you be able to drive?

"[DR. ROSAS]: You would not be able to drive well. You would get in a car accident.

10

"THE COURT:  So this -- I'm taking unconscious means your eyes are closed or you're out.  [¶]  But are you using a different definition?

"[DR. ROSAS]:  Well, the thing is with your blood level -- I mean it's .22 at a certain timeframe.  I mean you can get in a car.  At, you know, certain -- at a certain time your blood alcohol is getting -- rising higher and you get in that car and you start coming down and then, you know, you -- you're -- you have a car accident and you're -- you are there at the .22.  [¶]  And then the blood alcohol level has -- you know, there is multiple factors -- physiological factors based on your body size or what your tolerance level is.  [¶]  So a .22 is very high.

"[DEFENSE COUNSEL]:  So going back to the question, you testified earlier that a .22 is very high; right?

"[DR. ROSAS]:  Yes.

"[DEFENSE COUNSEL]:  And then you will expect that person who was a .22 to be unconscious; is that right?

"[DR. ROSAS]:  Yes.  [¶]  But there are other physiological factors.

"[DEFENSE COUNSEL]:  We will get there.  [¶]  The first part of your response was you would expect a person who was .22 to be unconscious; is that right?

"[DR. ROSAS]:  That's what I first said, yes.

"[DEFENSE COUNSEL]:  Right.

"[DR. ROSAS]:  But there are other factors --

"[DEFENSE COUNSEL]:  Are you changing that now?

"[Prosecutor objects.]

"[Trial court sustains prosecutor's objection.]

 "[DEFENSE COUNSEL]:  So you initially said that at .22 the person would be unconscious?

"[DR. ROSAS]:  I did say that initially.

11

"[DEFENSE COUNSEL]: Okay. And when you said that you also had in mind what the patient told you happened to her; right?

"[DR. ROSAS]: That's not what I was thinking about.

"[DEFENSE COUNSEL]: You had that in your mind; right?

"[DR. ROSAS]: No.

"[DEFENSE COUNSEL]: You knew --

"[DR. ROSAS]: Yes. Yes. [¶] Because we had just been talking about the -- that's her blood alcohol level while she was asleep. [¶] But that's -- when I was asking [*sic*] that question that is actually what I was thinking about.

"[DEFENSE COUNSEL]: So if a person's unconscious you mean out; right? [¶] Not awake -- that's what you mean by unconscious; right?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And so if a person is unconscious it would be impossible for that person to drive?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And then there are other factors -- potential factors that could play into whether or not a person is conscious or unconscious at a .22.

"[DR. ROSAS]: Yes. [¶] There [are] other physiological factors.

"[DEFENSE COUNSEL]: Such as -- the height of a person -- how big they are; right?

"[DR. ROSAS]: More how big they are, not necessarily the height.

"[DEFENSE COUNSEL]: Okay. So how would you characterize [the victim's] size?

"[DR. ROSAS]: She's petite.

"[DEFENSE COUNSEL]: Petite. [¶] So at .22 with her petite stature you would expect her to be unconscious. [¶] Is that what you're saying?

"[DR. ROSAS]: More likely, yes.

12

"[DEFENSE COUNSEL]:  Would you expect that she would be able to drive any distance?

"[DR. ROSAS]:  Depending on -- the other physiological factor would be her alcohol tolerance.

"[DEFENSE COUNSEL]:  [¶] . . . [¶]  Do you know what that is?

"[DR. ROSAS]:  No, I don't.

"[DEFENSE COUNSEL]:  Would you expect that a person who was .22 to be able to communicate with somebody?

"[DR. ROSAS]:  Not very well.

"[DEFENSE COUNSEL]:  And would you expect at a .22 if that person is talking to a police officer that she would not be able to talk that way?

"[DR. ROSAS]:  No.  [¶]  I would not expect her to communicate very well.

"[DEFENSE COUNSEL]:  And do you know whether or not [the victim] was able to communicate with the police officer while she was at about that blood alcohol level?

"[PROSECUTOR]:  Objection.  Assumes facts not in evidence.  Speculation.

"[DEFENSE COUNSEL]:  I'll rephrase.

"THE COURT:  Yeah.  [¶]  Maybe if you can relate it to a particular time in question.  [¶]  I think the testimony has been that the . . . estimated B.A. blood alcohol level at 11:23 was .22.  [¶]  But we have a span of a number of hours here.

"[DEFENSE COUNSEL]:  I understand.  [¶]  Do you know that [the victim] was able to talk to a police officer at all that night?

"[DR. ROSAS]:  Yeah.  [¶]  She was -- she was brought in by a police officer before she came to my office.

"[DEFENSE COUNSEL]:  And you know that she gave a statement[,] too[,] earlier in the evening; correct?

"[DR. ROSAS]:  Yes.

13

"[DEFENSE COUNSEL]: And you're aware of how alcohol absorbs into the body and then leaves the body?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And what rate is that?

"[DR. ROSAS]: I don't know exactly.

"[DEFENSE COUNSEL]: Part of that is because you haven't been specifically trained to testify in those respects?

"[DR. ROSAS]: No. [¶] That's not my area of expertise.

"[DEFENSE COUNSEL]: Your area of expertise is simply to do a physical exam of people who claim to have been the victim of sexual assault?

"[DR. ROSAS]: I have other areas of expertise. [¶] But that's one of them, yes.

"[DEFENSE COUNSEL]: And -- but the other areas do not involve testifying as an expert in alcohol and its effects on people?

"[DR. ROSAS]: Correct.

"[DEFENSE COUNSEL]: It's not in how alcohol absorbs in and out of the system?

"[DR. ROSAS]: Correct.

"[DEFENSE COUNSEL]: And you're here today -- even though [you] may have had some general training in alcohol through your many years of education and experience you're here today to talk about what you did in this case; right?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And your examination of [the victim]?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And when you spoke to [the victim] at 4:30 in the morning did you know what her blood alcohol level was?

"[DR. ROSAS]: No.

"[DEFENSE COUNSEL]: But she was able to communicate with you?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: Was she able at least from appearances to answer your questions?

"[DR. ROSAS]: Yes.

"[DEFENSE COUNSEL]: And she was able to respond to them?

"[DR. ROSAS]: Yes."

After other questions about the absence of injury, the following occurred:

"THE COURT: How does the shock of a sexual assault affect blood alcohol level or cognitive skills, adrenaline levels, and such?[6]

"[DR. ROSAS]: The shock of a sexual assault doesn't affect the blood alcohol level. Again that's something independent -- relates to the physiology of the body. [¶] The shock of a sexual assault though can affect a person's memory and what they are able to recall. [¶] And so again it's not unusual that during the exam what they don't remember in the beginning of the exam they -- they start remembering towards the end of the exam or they may remember days later . . . .

"THE COURT: The last part was adrenaline level and such. [¶] . . . [¶]

"[DR. ROSAS]: The adrenaline levels and such -- you know, it's part of your hormones that you -- do start flowing -- your adrenaline -- when you are stressed or when you have a very excitable sort of event like a sexual assault. [¶] And those hormones don't have as much effect on the blood alcohol level. [¶] But they do affect your ability to remember things.

"THE COURT: So are you saying that the shock of a sexual assault might stimulate adrenaline levels?

"[DR. ROSAS]: Yes.

_____

**6** It appears from the trial court's reference, *post*, to "a different juror" asking a question "along similar lines" that this question was posed by a juror.

15

"THE COURT:  A different juror asks a question somewhat along similar lines. [¶]  If a person with a .22 per[cent] blood alcohol level has a traumatic experience, would that affect the level of drunkenness because of an adrenaline rush or something like that?

"[DR. ROSAS]:  I -- I think I should stop asking [*sic*] questions about blood alcohol.

"THE COURT:  If you don't have the necessary training and experience or education to answer it, just say so.

"[DR. ROSAS]:  Yeah.  [¶]  I think I should stop answering questions about it.

"THE COURT:  Okay. . . ."

At the end of the trial, the trial court instructed the jury with CALCRIM No. 332, the standard instruction on expert testimony, which tells the jurors that they are not required to accept an expert's opinion as true.  The instruction further explains that "[i]n evaluating the believability of an expert . . . consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion."

## B.  Analysis

Defendant concedes that, since his trial counsel did not object -- and "likely acquiesced" at least to the initial admission of the evidence -- his appellate claim is one of ineffective assistance of counsel under the Sixth Amendment to the federal Constitution (see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692 [80 L.Ed.2d 674] (*Strickland*)) and section 15 of article I of the California Constitution (see *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*)).  To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland*, at pp. 688, 691-692; *Ledesma*, at pp. 216-217.)  " 'Surmounting *Strickland*'s high bar is never an easy task.' "  (*Harrington*

*v. Richter* (2011) 562 U.S. 86, ___ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, ___ [176 L.Ed.2d 284, 297].)

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.  [Citation.]  . . .  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'  [Citations.]"  (*Richter*, *supra*, 178 L.Ed.2d at p. 642.)

" 'If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation.' "  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053, citing *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Here, defendant argues the doctor's testimony (1) lacked foundation and was unqualified, (2) addressed an ultimate issue in the case on the question whether the victim was unconscious, and (3) served to let the jury know how the doctor thought the case should be decided.  Defendant argues there could be no satisfactory explanation for trial counsel's failure to object, because the doctor was not qualified to give any opinion about the effects of alcohol.

We disagree that there could be no tactical purpose.  To the contrary, defense counsel's own questioning of the doctor reveals possible tactical purposes:  (1) to persuade the jury that, since the victim was able to drive herself safely to McDonald's shortly after the incident and communicate with the police, her intoxication did not render her unconscious and hence unable to give consent; or (2) that she was too drunk to remember that she gave consent.  There is "no expectation that competent counsel will be a flawless strategist or tactician" (*Richter*, *supra*, 178 L.Ed.2d at p. 646), and counsel's

17

strategy is not constitutionally deficient just because it may not have worked. (*Id*. at p. 645 [defense counsel is not incompetent merely because the defense strategy did not work out as well as counsel had hoped].)

Moreover, defendant fails to show prejudice. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 178 L.Ed.2d at p. 642.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "The likelihood of a different result must be substantial, not just conceivable." (*Richter*, at p. 647.) Here, the doctor's testimony on whether a person would be unconscious at a 0.22 blood-alcohol level was equivocal, she acknowledged that other factors came into play and essentially said the issue was for the jury to decide. Additionally, the jury was instructed with the standard instruction on expert testimony that clearly advised the jury they did not have to accept the doctor's testimony. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Defendant has not established that it is reasonably probable he would have obtained a more favorable result had the doctor given testimony about the effects of alcohol.

Defendant argues that, had defense counsel not opened the door to the doctor's unqualified expert opinion, the defense could have made an argument that, if the victim was so drunk she was unconscious, the prosecution would have produced an alcohol expert to say so. We question whether such argument would have been proper, since it is clear that reaction to alcohol depends on individual tolerance and other factors. In any event, Dr. Rosas did not deprive the defense of any arguments, as she never conclusively said the victim was unconscious. Furthermore, defendant has not shown that it is reasonably probable he would have obtained a more favorable result had he been able to make this argument.

We conclude defendant fails to show grounds for reversal based on the doctor's testimony regarding the effects of alcohol.

## II. Absence of Physical Injury

Defendant argues that trial counsel was ineffective in failing to object to Dr. Rosas's testimony that the absence of physical injury to the victim's genitals was consistent with a sexual assault. Defendant argues this testimony did not assist the jury and instead constituted improper vouching for the prosecution's case. He asserts that for this reason, defense counsel should have objected. We see no basis for reversal.

On direct examination, Dr. Rosas was asked, "Would [] the lack of any vaginal injuries -- is that consistent or inconsistent with the assault that [the victim] described to you?" The doctor replied, "consistent." The doctor went on to testify that about half of adults complaining of nonconsensual sex have no genital injury. In response to the prosecutor's question about how the lack of physical injuries would be consistent with nonconsensual intercourse, the doctor explained that the vagina is an elastic object and it stretches to accommodate sexual acts, lubrication may be present regardless whether the sex is consensual or nonconsensual, or the person may be unconscious and therefore offer no resistance.

We agree with the People that the evidence was relevant on the issue whether the sex was consensual, and it was a proper subject of expert opinion because it would be beyond common experience why a woman who claimed to be raped might have no genital injury. (Evid. Code, § 801; *People v. Chapple* (2006) 138 Cal.App.4th 540, 546-547 [purpose of expert testimony is to provide an opinion beyond common experience].)

Defendant concedes it "may have been proper" for the doctor to opine a lack of injury does not prove or disprove a sexual assault, by testifying that the lack of injury is "not inconsistent with" a sexual assault, but here the doctor crossed a line by saying the facts were "consistent with" sexual assault. We disagree, because the doctor also testified the lack of injury was also consistent with consensual sex. Any objection to the

19

choice of words here would have simply resulted in a rephrasing of the question and answer that would have yielded the same evidence. Defendant argues that, because the doctor was the director of a forensic team of specialists, her "consistent with" testimony was "cloaked with the aura of medical professionalism." We believe the testimony's effect asserted by defendant is exaggerated, and anyway, as indicated, the doctor also testified the lack of injury was also consistent with consensual sex.

Defendant says there could be no tactical reason for his trial counsel not to object. However, trial counsel could have reasonably concluded that to object on the grounds defendant now asserts would be viewed by the jury as hair splitting and obstreperous when the doctor would have been allowed convey the same message upon rephrasing of the questions. Moreover, counsel could have reasonably felt a change of wording to "not inconsistent with" would not have helped defendant, and the lack of physical injury was a point favorable to the defense.

Defendant claims the doctor "pretty much" acknowledged this testimony was irrelevant, and the purpose of the forensic examination was to repair any physical injury and recover DNA. However, what the doctor said was that studies indicated it did not matter whether or not the victim struggled because such struggle will not necessarily cause genital injury.

Defendant also fails to show any prejudice. As indicated, the doctor testified the lack of injury was equally consistent with consensual sex. Moreover, defendant's acquittal of the forcible rape charge further shows the absence of prejudice.

Defendant argues he was prejudiced because the doctor improperly bolstered the victim's credibility by "parrot[ting] or regurgitat[ing]" the victim's story that she had been asleep when the sex began and too drunk to consent. However, the doctor did not claim to have any truth-divining test or skill; she merely related what the patient said.

Defendant has not shown that the lack of an objection amounted to constitutionally deficient performance or that it is reasonably probable he would have obtained a more

20

favorable result had the doctor testified that the lack of injuries was not inconsistent with sexual assault. We conclude defendant fails to show grounds for reversal in the doctor's testimony about the lack of physical injury.

### III. Hearsay

Defendant complains the trial court improperly admitted the victim's hearsay statement to a police officer at the scene that she had been raped and the people inside the home knew the identity and location of the perpetrator. We see no grounds for reversal.

### A. Background

The prosecution moved in limine to admit into evidence, as "fresh complaint[s]" and spontaneous declarations (Evid. Code, § 1240), the victim's hearsay statements to Sanjay as the victim ran out of the room crying, to her cousin Alex, and to the police at the scene. The trial court allowed the statement to Sanjay as fresh complaint and the statements to the victim's cousin and to the police officer as spontaneous declarations. On appeal, defendant challenges only the statements to the police.

The officer testified he was dispatched to the scene around 2:23 a.m. on April 23, 2010. The officer testified that in his initial contact with the victim outside the house, she "made a spontaneous statement that she was raped and the people inside knew the person that did it and where he was at." The officer testified that, when the victim made this statement, "she appeared very upset about what had happened to her. And when she was explaining it to me I could see that she was very mad, pissed off. She was distraught. She . . . just had mixed emotions." This was about three hours after the sexual assault, which occurred around 11:20 p.m. -- the timing of which defendant says can be inferred from the parties' stipulation of the victim's blood-alcohol level at 11:20 p.m.

21

## B. Analysis

A spontaneous declaration is an exception to the hearsay rule. (Evid. Code, § 1240.[7]) It is a statement made without deliberation or reflection. (*People v. Raley* (1992) 2 Cal.4th 870, 892 (*Raley*).) " 'The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).) To be admissible, the utterance must (1) be made in nervous excitement produced by a startling occurrence, (2) before there was time to contrive, while the declarant's reflective powers were in abeyance, and (3) relate to the circumstances of that occurrence. (*Id*. at p. 318.)

" '[N]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.' [Citation.]" (*Raley*, *supra*, 2 Cal.4th at p. 893.) "The requirement is for a spontaneous declaration, not an instantaneous one." (*People v. Riva* (2003) 112 Cal.App.4th 981, 995; see *People v. Brown* (2003) 31 Cal.4th 518, 541 [statement made two and a half hours after the event]; *Raley*, at pp. 893-894 [18 hours].) " 'The crucial element . . . [is] the mental state of the speaker. The nature of the utterance--how long it was made after the startling incident and whether the speaker blurted it out, for example--may be important, but solely as an indicator of the mental state of the declarant.' " (*Raley*, at pp. 892-893.) Whether a statement constitutes a

---

[7] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

spontaneous declaration is generally a question of fact for the trial court.  (*Poggi*, *supra*, 45 Cal.3d at p. 318.)  On review, we apply the abuse of discretion standard.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  Even if the trial court abuses its discretion in determining that a statement is a spontaneous declaration, the harmless error rule may still apply -- the reviewing court will not reverse the judgment unless it is reasonably probable a different result would have occurred had the statement been excluded.  (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526 (*Ramirez*).)

Here, defendant argues the victim had "ample opportunity" to reflect and deliberate in the three hours between the incident around 11:20 p.m. and her statement to the police officer at 2:23 a.m.  We disagree with defendant's calculation of how long it should take a woman to calm down after waking to find herself being subject to nonconsensual sexual intercourse.  Moreover, as we have noted, " '[t]he lapse of time between the described event and the statement, although a factor in determining spontaneity, is not determinative.' "  (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 789.)  Lapse of time does not deprive statements of spontaneity " ' " '*if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*.' "  [Citation.]' "  (*Id*. at p. 789.)

Defendant points out the victim did not call the police right away and instead engaged in "activity" -- getting dressed, trying to get the license number of defendant's car, driving to McDonald's, calling her cousin, going to the tow yard with her cousin to look for defendant's car, and returning to the house.  Defendant claims the victim's "activity" required " 'thinking clearly' " and shows a presence of mind inconsistent with an unreflecting expression of impressions.  However, acting on survival instincts -- pulling on her clothes, fleeing to a public place, and phoning for help -- is not inconsistent with spontaneous declaration.  And it was her cousin who directed the activities once he arrived.  That leaves only the victim's attempt to get the license plate number.  The victim testified she wanted to leave, but red car was blocking her car.  "I

23

realized that the red [car] belonged to [defendant] and I wanted to get the license plate number" so the police could find out who assaulted her. She was in her car trying to find a pen when Indy moved the red car away. Given the totality of circumstances, the victim's attempt to get the license number does not defeat the court's finding of spontaneous declaration.

Defendant suggests the victim was not emotional when she first spoke with the officer because, even though the officer testified the victim "did seem upset" and was "very mad" and "pissed off," his police report did not say that she was emotional but merely said she was unsteady, smelled of alcohol, and had bloodshot eyes. Defendant adds the victim said she was not crying when she spoke with the officer. However, the officer's trial testimony suffices, and defendant cites no evidence or authority requiring the officer to document the victim's emotions in the police report.

None of the circumstances cited by defendant demonstrate that the trial court abused its discretion in determining the victim's statement to the police was admissible as a spontaneous declaration. Additionally, the court's finding is buttressed by the evidence that the victim had not calmed down after leaving the house. The victim's cousin Alex testified she called him somewhere between 11:00 p.m. and 1:00 a.m., distraught, and said she had been raped. When Alex arrived at McDonald's about 35 to 45 minutes later, the victim "was not like herself at all." She was "very down, very sad," and "also angry." "[S]he was upset. She was emotional about what happened . . . ."

Defendant relies on *Ramirez*, *supra*, 143 Cal.App.4th 1512, but acknowledges that the deliberative and reflective process exhibited by the victim in that case is distinguishable from the victim in this case. The court in *Ramirez* held the trial court abused its discretion by allowing hearsay statements to come in as spontaneous declarations, but the error was harmless. (*Id*. at p. 1526.) In that case, the defendant and the 16-year-old victim had been drinking tequila in a hotel room with the victim's friend and the defendant's friend. (*Id*. at pp. 1517-1518.) The defendant and the victim left in a

24

car around 2:00 a.m. to get more alcohol. (*Ibid*.) While in the car, the defendant made sexual advances, which the victim rebuffed. She felt dizzy, closed her eyes, and opened them to find defendant raping her in the back seat of the car. He refused to stop. The defendant and the victim returned to the hotel room around 4:30 a.m. (*Id*. at pp. 1519, 1524.) The victim was crying. When her friend asked what was wrong, the victim said she did not know. The victim showered for ten minutes because she " 'felt dirty.' " (*Id*. at p. 1518.) The victim said she wanted to leave, but her friend wanted to stay, and the defendant and the victim's friend prevented the victim from leaving. (*Id*. at p. 1519.) Eventually, the victim got back into the car with the defendant, who was supposed to take her home. (*Ibid*.) She fell asleep in the car and awoke in a strange apartment around 7:00 a.m. (*Ibid*.) She told strangers in the apartment that she had been raped, it hurt, and she lived with her brother. The strangers suggested calling home, but the victim said no, " '*My brother is going to kill me*.' " (*Ibid*., italics added.) When the stranger said she would call the police, the victim ran out of the apartment. (*Ibid*.) The victim returned to the hotel around 8:30 or 9:00 a.m. The clerk noticed the victim was crying and looked frightened. He asked if she was okay; she responded that she wasn't okay, that she had been raped by " 'Guillermo' " (the defendant's first name), and that she was still bleeding. She did not want the clerk to call an ambulance. The clerk let her use the bathroom and made phone calls for the victim until he reached someone to come get her. (*Id*. at pp. 1519-1520, 1525.) The *Ramirez* court reasoned that the evidence indicated the victim in fact deliberated or reflected on what had happened. (*Id*. at p. 1525.) In the strange apartment, though she was upset and crying, she was able to relate in detail the events of the previous evening and told them a number of times that she was worried what her brother might do if he found out. (*Ibid*.) At the hotel, she asked the clerk to call several of her friends because she needed a ride, and she asked if she could use the bathroom. When she returned ten minutes later, the clerk asked her a couple of times if she was okay. Only after the second inquiry did the victim say she had been raped. She

25

declined the offer of an ambulance, saying she was afraid what her brother would do if he found out what happened.  (*Ibid*.)  The *Ramirez* court said, "The narrative style as well as the quantity, detail and content of [the victim's] statements suggest that they were not spontaneous statements made under the stress of excitement without deliberation or reflection, but rather, that they were made after [the victim] had engaged in a deliberative or reflective process."  (*Ibid*.)  However, the erroneous admission of her statements was not prejudicial.

Here, there is no evidence like the *Ramirez* victim's statement about her brother being mad that shows the victim in the instant case was thinking clearly and engaged in deliberation, other than the thought about getting the license number.  This sole item does not defeat the determination that her later statement to the police was a spontaneous declaration, given the totality of circumstances.

We conclude the trial court did not abuse its discretion in allowing the evidence.

Even if the trial court erred, the error was harmless because it is not reasonably probable that defendant would have obtained a more favorable result had the statement been excluded.  (*Ramirez*, *supra*, 143 Cal.App.4th at p. 1526.)  The victim's statement to the police was cumulative to her own trial testimony and the testimony of her cousin regarding her earlier spontaneous declaration to him.  Moreover, even without the officer's testimony that the victim reported the rape to him, the jury would have known she had done so, because after encountering her, the officers went into the house to look for defendant and Dr. Rosas testified she conducted a sexual assault examination of the victim by referral from law enforcement.

We conclude defendant fails to show grounds for reversal based on hearsay.

### IV.  Claim of Cumulative Trial Error

Defendant contends the foregoing purported trial errors cumulatively, if not individually, compel reversal.  (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  The litmus test is whether the defendant received due process and a fair trial.  (*People v. Kronemyer*

26

(1987) 189 Cal.App.3d 314, 349.)  Having reviewed the foregoing claims of error, we see no grounds for reversal based on cumulative error.

## V.  Denial of Probation

Defendant argues the trial court abused its discretion by not giving him probation and a jail sentence instead of state prison, because of the overall factual circumstances and the purported likelihood that defendant would be a good candidate for probation.  We disagree.

Adult probation is not a right; rather it is " 'an act of leniency.' " (*People v. Birmingham* (1990) 217 Cal.App.3d 180, 185.)  A trial court has broad discretion whether to grant probation, and its discretion will not be disturbed on appeal unless the defendant shows that the trial court acted in an arbitrary or capricious manner exceeding the bounds of reason.  (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1256-1257.)

California Rules of Court, rule 4.414, provides criteria affecting the decision to grant or deny probation, including (1) facts relating to the crime -- such as the nature, seriousness, and circumstances of the crime as compared to other instances of the same crime; vulnerability of the victim; whether the defendant inflicted emotional injury -- and (2) facts relating to the defendant -- such as prior criminal record, whether he is remorseful, and the likelihood he would be a danger to others if not imprisoned.  Rule 4.410(a), which defendant ignores, sets forth the general objectives of sentencing:  "(1) Protecting society;  [¶]  (2) Punishing the defendant;  [¶]  (3) Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses;  [¶] (4) Deterring others from criminal conduct by demonstrating its consequences;  [¶]  (5) Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration;  [¶]  (6) Securing restitution for the victims of crime; and  [¶]  (7) Achieving uniformity in sentencing."  Rule 4.409 provides that the trial court need not expressly state its consideration of each factor, and the court will be deemed to have considered the factors unless the record affirmatively reflects otherwise.  Furthermore,

27

we must presume that the trial court considered the factors discussed in a defendant's statement of mitigation when the court has indicated it has read the statement. (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1317-1318, disapproved on another ground in *People v. Cook* (2015) 60 Cal.4th 922, 939.)

The probation report revealed that defendant, then age 19, is a first-time offender with strong family support and a job working for his family's towing business. However, his score on the Static 99, which has been shown to be a moderate predictor of sexual re-offense potential, placed defendant in the medium-high risk category for being charged or convicted of another sexual offense.

At a sentencing hearing on June 30, 2011, the trial court heard a victim impact statement explaining the emotional and mental stress defendant's conduct had brought the victim and her family. The court also heard from defendant's father and two supporters asking that defendant be given a second chance. The court said it had read the probation report and the numerous letters from defendant's supporters. Many of the letters are from family friends or business connections of the family business, Five Star Towing. For example, a retired correctional officer wrote he has known defendant's family for years, has known defendant as nothing but an "obedient and diligent kid" who respects his peers and elders and gets along with people. The writer said defendant is extremely sorry he committed the crime. The writer said defendant has never before been in trouble with the law, and "therefore I request you to take a decision that will help him become a good citizen."

At defendant's request, the trial court suspended the hearing to give defendant an opportunity to arrange for a psychiatric examination. When the hearing continued on July 27, 2011, the court said it had read the sealed psychiatric report. The trial court ruled:

"[A]s the probation report noted, the Defendant is eligible for probation. The Probation Department recommends that probation be denied due to the nature, the

28

seriousness and the circumstances of the crime, and also that the victim is desirous of a state prison commitment as a punishment for this offense. I agree.

"I'm going to follow the recommendation of the probation report. This was not a typical rape of an unconscious victim. The reasons articulated by [the prosecutor] put this in a special category. This victim was especially vulnerable. The crime was predatory in nature.

"I don't dispute that the Defendant makes a strong case for being able to perform successfully on probation. I'm certainly aware of his age. I recognize that he has a very supportive family, friends in the community, and I regret that those people will be disappointed by this sentence. But the crime was very serious. The circumstances warrant a prison commitment.

"As did the jury, I also reject the Defendant's testimony which was self-serving and simply not true. I don't doubt that he's remorseful at this point but, in effect, he did perjure himself at the trial. So probation is denied for those reasons."

The court sentenced defendant to the low term of three years.

On appeal, defendant reiterates the factors that he believes warrant probation. However, the presence of factors favorable to probation does not show the trial court abused its discretion in denying probation. Defendant misstates the record by claiming the trial court "appeared to simply gloss over" the mitigating circumstances.

Defendant contends the jury disbelieved the victim, because the jury acquitted defendant of forcible rape. However, the jury may have concluded the rape was not forcible because the victim was unconscious, was able to get out from underneath defendant upon becoming conscious of the rape, put her clothes on in the room where the rape occurred, leave the room without impediment by defendant, and then later reported to Dr. Rosas that she had not been grabbed, pinched, or physically restrained in any way.

Defendant argues that the court reviewed the psychiatric evaluation he submitted and did not specifically find that he was likely to be a danger to others. The psychiatrist,

Dr. Janak Mehtani, said defendant was "allegeable" for probation. The doctor said defendant did not want to talk about the incident because he had already been found guilty, "expressed his remorse and felt bad about being in a difficult situation," said "alcohol had a lot to do with his action at that time and he wished he had not been in that situation" and felt remorse for his behavior. The doctor opined defendant has no major psychiatric disorder, "is not a danger to himself or others because of any psychiatric disorder," and the risk of him reoffending "is very low or nonexistent." This does not demonstrate abuse of discretion. Particularly since, as we have noted, the Static 99 indicated a medium-high risk of sexual reoffending.

We conclude the trial court did not abuse its discretion in denying probation.

### VI. Section 4019 - Presentence Conduct Credits

We allowed the parties to file supplemental briefs on defendant's new claim that the amendment to section 4019, effective October 1, 2011, must be retroactively applied to increase his presentence conduct credits for this crime committed in April 2010, for which defendant was convicted in June 2011 and sentenced in July 2011.

Thereafter, this court held that the October 1, 2011, amendment is not retroactive. (*People v. Lynch* (2012) 209 Cal.App.4th 353, 356.) For the reasons discussed in *Lynch*, we conclude that defendant is not entitled to additional conduct credits.

## DISPOSITION

The judgment is affirmed.

        MURRAY      , J.

We concur:

      HULL      , Acting P. J.

      HOCH      , J.